THE THAI PINEAPPLE PUBLIC CO., LTD., Siam Food Products Public Co., Ltd., Malee Sampran Factory Public Co., Ltd., and Siam Agro Industry Pineapple and Others Public Co., Ltd.,Plaintiffs–Appellees,

and

Dole Food Company, Inc., Dole Packaged Foods Company, and Dole Thailand, Ltd., Plaintiffs–Appellees,

v.

UNITED STATES, and Department of Commerce, Defendants–Appellants,

and

Maui Pineapple Co., Ltd., Defendant–Appellant.

Nos. 97–1424, 97–1437.

United States Court of Appeals, Federal Circuit.

July 28, 1999.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Oct. 28, 1999.

Kenneth J. Pierce, Willkie Farr & Gallagher, Washington, DC, for plaintiffs-appellees, The Thai Pineapple Public Co., Ltd., et al. With him on the brief was William B. Lindsey. Of counsel were Lyle B. Vander Schaaf, Robert L. LaFrankie and Matthew Nicely.

Steven M. Schneebaum, Patton Boggs, L.L.P., Washington, DC, argued, for plaintiffs-appellees, Dole Food Company, Inc., et al. Of counsel on the brief was Michael D. Esch, Hale and Dorr, L.L.P., Washington, DC. Of counsel was John F. Cobau, Patton Boggs, L.L.P.

Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued,

for defendants-appellants, United States, et al. With him on the brief was David M. Cohen, Director. Of counsel on the brief were Stephen J. Powell, Chief Counsel for Import Administration; Elizabeth C. Seastrum, Senior Counsel; and Stacy J. Ettinger, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC. Of counsel were Velta A. Melnbrencis, Attorney, and Berniece A. Browne, Attorney, Department of Justice, Washington, DC.

Paul C. Rosenthal, Collier, Shannon, Rill & Scott, PLLC, Washington, DC, argued, for defendant-appellant, Maui Pineapple Co., Ltd. With him on the brief was Lynn Duffy Maloney.

Before RICH,* Circuit Judge,
ARCHER, Senior Circuit Judge, and
RADER, Circuit Judge.

## DECISION

ARCHER, Senior Circuit Judge.

The United States, the Department of Commerce (Commerce) and Maui Pineapple Co., Ltd. (Maui) (collectively Appellants) appeal from the judgment of the Court of International Trade, holding that Commerce's determinations relating to the allocation of the cost of purchased raw material – fresh pineapple fruit – between canned pineapple fruit and other products were unsupported by substantial evidence, arbitrary, capricious, and contrary to law. The court remanded the case for recalculation of the anti-dumping duty margins (dumping margins) using either the Thai producers' weight-based allocation methodologies or a non-output price-based cost allocation methodology. See Thai Pineapple Public Co., Ltd. v. United States, 946 F.Supp. 11 (CIT 1996) (Thai Pineapple I). On remand, Commerce calculated fruit costs for the Thai producers using their

submitted weight-based fruit cost allocation methodologies. The Court of International Trade sustained the remand results and entered final judgment on March 18, 1997. See Thai Pineapple Public Co., Ltd. v. United States, 1997 WL 129156 (CIT March 18, 1997) (Thai Pineapple II). Appellants challenge the Court of International Trade's conclusion that Commerce wrongly allocated raw material costs in rendering its Final Determination of Sales at Less Than Fair Value: Canned Pineapple Fruit From Thailand, 60 Fed. Reg. 29553 (June 5, 1995), as amended, 60 Fed.Reg. 36775 (July 18, 1995) (Final Determination). We reverse.

## BACKGROUND

In response to a petition filed on behalf of the U.S. industry, Commerce initiated an investigation of canned pineapple fruit from Thailand. The investigation concerned Thai producers of canned pineapple fruit, including Dole Food Company, Inc. (Dole),[1] The Thai Pineapple Public Co., Ltd. (TIPCO), Siam Agro Industry Pineapple and Others Public Co., Ltd., (SAICO), and Malee Sampran Factory Public Co., Ltd. (Malee) (collectively Thai producers).[2] The Thai producers produced canned pineapple fruit as well as products outside the scope of the investigation such as pineapple juice and juice concentrate. These products use separate parts of the same fresh pineapple fruit and thus they share raw material costs. In its determination, Commerce had to calculate the Thai producers' cost of production for the purpose of determining dumping margins and, in so doing, had to allocate a portion of the shared pineapple fruit costs to canned pineapple fruit.

Commerce issued cost questionnaires to each of the Thai producers requesting both cost of production (COP) and constructed value (CV) information. In their financial

---

* Circuit Judge Rich died on June 9, 1999. This case was decided by the remaining judges in accordance with Fed. Cir. Rule 47.11.

1. Dole Packaged Foods Company is a division of the Dole Food Company, Inc., and Dole Thailand, Ltd. is a majority-owned subsidiary.

2. Siam Food Products Public Co., Ltd., although an interested party, was not a respondent in the administrative proceeding.

accounting records used to inform management, shareholders, and governmental authorities about the companies' financial condition TIPCO, SAICO and Malee (TIPCO et al.) allocated raw material costs between canned pineapple fruit and pineapple juice. These financial accounting records were audited and were kept in accordance with generally accepted accounting principles (GAAP) in Thailand. Dole allocated the entire cost of the purchased raw material to canned pineapple fruit. Although these allocation methodologies had been used for many years, when Commerce requested information the Thai producers argued that these methodologies were unreliable. According to the Thai producers, an alternative methodology was necessary because their financial accounting cost allocations were based on certain managerial and tax goals, and thus, were not reflective of actual production costs.

The Thai producers' alternative methodology was based upon the weight of fresh pineapple fruit used to produce the various pineapple products. The weight-based allocation resulted in a raw material cost for canned pineapple fruit that was less than the cost shown in their financial accounting records.

Commerce rejected the weight-based raw material fruit cost allocation for both COP and CV. In the final determination for TIPCO et al., Commerce relied upon the methodologies reflected in their financial accounting records. For Dole, Commerce used an average of the fruit cost allocation percentages used by TIPCO et al. As a result of its investigation, Commerce found that a large part of the Thai producers' canned pineapple fruit sales—more than 90% for certain types of canned fruit sales—were below the COP.

Dissatisfied with Commerce's *Final Determination*, the Thai producers filed actions in the Court of International Trade challenging, among other issues, Com-

merce's decision concerning fruit cost allocation. The court concluded that Commerce erred in its decision to rely upon the financial accounting records of TIPCO et al. It concluded that the "plaintiffs have demonstrated that the allocation formulas are unrelated to actual cost," and that "[a]lthough Commerce repeatedly noted the unreliability of the Thai plaintiffs' allocation methodologies, it continued to employ them simply because they were consistent with Thai GAAP." *See Thai Pineapple I*, 946 F.Supp. at 19–20. The court, relying on *IPSCO, Inc. v. United States*, 965 F.2d 1056 (Fed.Cir.1992) (*IPSCO III*), remanded the case to Commerce "to accept the weight-based allocation methodologies put forth by the Thai plaintiffs [TIPCO et al.] and Dole if they are otherwise acceptable, because these are cost, not price-based, methodologies, or it may rely on another non-output price-based cost allocation methodology." *Thai Pineapple I*, 946 F.Supp. at 24.

On remand, Commerce calculated fruit costs for the Thai producers using their submitted weight-based fruit cost allocation methodologies. The Court of International Trade sustained the remand results in *Thai Pineapple II*. Appellants challenge the Court of International Trade's conclusion that Commerce wrongly allocated raw material costs in rendering its *Final Determination*. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5)(1994).

## DISCUSSION

### I.

A. The antidumping laws provide that Commerce must impose an additional duty on imported merchandise that is being sold, or is likely to be sold, in the United States at less than its fair value to the detriment of a domestic industry. *See* 19 U.S.C. § 1673(1)-(2) (1988),[3] *Torrington Co. v. United States*, 82 F.3d 1039, 1041 (Fed.Cir.1996). The amount of the duty to

---

**3.** The antidumping laws were significantly amended by the Uruguay Round Agreements Act, Pub.L. 103–465, 108 Stat. 4809 (1994) (URAA). The URAA, however, does not apply to administrative reviews initiated prior to January 1, 1995. *See* URAA § 291(a)(2), (b). In the case at bar, therefore, we apply the statute that preceded the URAA.

be imposed, otherwise known as the "dumping margin," equals "the amount by which the foreign market value exceeds the United States price for the merchandise." 19 U.S.C. § 1673; *Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565, 1567 (Fed.Cir.1994).

Foreign market value is the price of the merchandise in the producer's home market or its export price to countries other than the United States. 19 U.S.C. § 1677b(a)(1); *see IPSCO III*, 965 F.2d at 1059. In the computing of foreign market value, § 1677b disregards, under specified circumstances, home or export market sales at less than the cost of production (COP). *See* 19 U.S.C. § 1677b(b). If home or export market sales do not yield a reliable measure of foreign market value, the statute directs computation of a constructed value (CV) in lieu of the foreign market value. *See id.* The constructed value serves as a minimum price level at which imported goods may be sold without incurring antidumping duties. *See IPSCO III*, 965 F.2d at 1059. Goods sold for less are assessed such duties in an amount designed to bring their effective price to the importer up to the minimum level. *NSK Ltd. v. United States*, 115 F.3d 965, 968 (Fed.Cir.1997).

■ B. In reviewing a decision by the Court of International Trade, this court applies anew the statutory standard of review applied by that court to the agency's decision. *See PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1236 (Fed.Cir.1992). Accordingly we will "uphold Commerce's determination unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Micron Technology, Inc. v. United States*, 117 F.3d 1386, 1393 (Fed.Cir.1997) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

## II.

Appellants contend that the Court of International Trade substituted its interpretation of the statute for that of Commerce, and that because the statute does not address the issue of cost allocations, the court should have deferred to Commerce's reasonable interpretation of the statute.

■ Our review centers on whether the agency's interpretations of statutes and regulations it administers are reasonable. *See Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Daewoo Elec. Co. v. International Union*, 6 F.3d 1511, 1516 (Fed.Cir.1993) *cert. denied*, 512 U.S. 1204, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994). We have held that Commerce is the "master of antidumping law," and reviewing courts must accord deference to the agency in its selection and development of proper methodologies. *See Daewoo*, 6 F.3d at 1516; *Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1044 (Fed.Cir.1996) (This court "accords deference to the determinations of the agency that turn on complex economic and accounting inquiries."). The methodologies relied upon by Commerce in making its determinations are presumptively correct. *See Fujitsu*, 88 F.3d at 1044. Even if it is possible to draw two inconsistent conclusions from evidence contained in the record, this does not mean that Commerce's findings are not supported by substantial evidence. *See id.*

During the administrative proceeding, Commerce calculated COP and CV. The statute does not specifically define COP, but the regulations state that it is "based on the cost of materials, fabrication, and general expenses, but excluding profit, incurred in producing such or similar merchandise." *See* 19 C.F.R. § 353.51(c); *IPSCO III* at 1060. Constructed value is generally defined as "the combined cost of materials, fabrications or other processing of any kind, general expenses and profit, and other incidental shipping expenses." *IPSCO III* at 1059.[4] "The cost of materi-

---

4. [T]he constructed value of imported merchandise shall be the sum of –·

(A) the cost of materials (exclusive of any internal tax ... ) and of fabrication or other

als encompasses the cost of raw components in the manufacturing process." *Id.* Both calculations required Commerce to determine the cost of materials. *See* 19 C.F.R. § 353.51(c); 19 U.S.C. § 1677b(e)(1)(A).

■ In order to determine the material cost for canned pineapple fruit Commerce had to allocate the pineapple fruit costs between canned pineapple fruit and pineapple juice (which was not a subject of investigation). The statute does not expressly authorize any specific allocation methodologies between items produced jointly. *See IPSCO III* at 1060. As a general rule, an agency may either accept financial records kept according to generally accepted accounting principles in the country of exportation, or reject the records if accepting them would distort the company's true costs. *See NTN Bearing Corp. v. United States,* 74 F.3d 1204, 1206 (Fed.Cir.1995).[5] Because the parties agree that the Thai producers' books and records were consistent with Thai GAAP, we need only consider whether Commerce was reasonable in accepting the allocation methodologies as reflected in the books and records of TIPCO et al.

A. TIPCO et al.

TIPCO et al. contend that their allocation methodologies used in the normal course of their businesses do not account for fluctuations in relevant costs or prices, and are not based on any actual company experience. They assert that their allocation formulas have no basis in fact, or are based on rough estimates, averages, and standard numbers.

In reviewing the allocation methodologies of TIPCO et al., Commerce noted that

their normal allocation methodologies were relatively consistent, allocating a range of 82 to 91% of the pineapple fruit costs to canned pineapple fruit production, and 9 to 18% to production of juice products, and thus recognized that some measure of value existed for the portion of the pineapple fruit used for juice production. Furthermore, the description of the production process provided to Commerce by TIPCO et al. reflects a distinction in the quality and portions of pineapple fruit used to produce canned pineapple fruit and juice that is consistent with the normal allocation in their books and records.

Commerce also found the books and records of TIPCO et al. to be reasonably reflective of their costs because their normal allocation methodologies were used for a number of years, accepted by independent auditors and historically relied upon to present important financial information to shareholders, lenders, tax authorities, auditors, and other third parties. In considering the contention that the normal allocation methodologies were designed to achieve certain managerial and tax goals, Commerce stated that records constructed for these reasons were not necessarily unreliable or unreasonable, especially in light of their acceptance by independent auditors. Finally, Commerce noted that the Thai producers "did not provide any examples of companies that use weight-based fruit cost allocations as the basis for financial or managerial reporting." *Final Determination* at 29562.

TIPCO et al. argue further that Commerce's deviation from their records with respect to sugar costs, direct labor costs, fruit receiving and common processing costs, plantation overhead costs, animal

processing of any kind employed in producing such or similar merchandise ...
(B) an amount for general expenses ... and
(C) the cost of all containers and coverings of whatever nature....
19 U.S.C. § 1677b(e)(1).

**5.** We note that this rule is now codified in 19 U.S.C. § 1677b(f)(1)(A)(1996):

Costs shall normally be calculated on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and *reasonably reflect* the cost associated with the production and sale of the merchandise....
(Emphasis added).

feed, and asset sales is an indication of the unreasonableness of Commerce's reliance on their normal allocation methodologies. Commerce points out, however, that the Thai producers' records did not provide at all, or provided only minimally, for allocation of the above shared costs that it allocated between canned pineapple fruit and other pineapple products. Thus, Commerce had to allocate costs that were not already allocated, or were not deemed accurately allocated, between canned pineapple fruit and other products. Moreover, with respect to fruit receiving costs, TIPCO et al. requested that Commerce reallocate costs because their allocations assigned all these costs to canned pineapple fruit.

In making its determination, Commerce noted that

> [it] generally prefers to rely on costs calculated in a manner consistent with the [Thai producers'] normal accounting methodologies and historically utilized by the company. This does not suggest[ ] that [Commerce] will rigidly adhere to each of [the Thai producers'] normal accounting practices, particularly when such practices are deemed inappropriate or imprecise for purposes of computing costs in an antidumping proceeding. In those circumstances, [Commerce] will make certain adjustments that capture more accurately the costs incurred by [the Thai producers'] during the period of investigation or review.

J.A. at 594 (Department of Commerce Concurrence Memorandum of May 26, 1995, at 38). To the extent that the records of TIPCO et al. reasonably reflect the costs of production, Commerce may rely upon them. *See NTN Bearing Corp.*, 74 F.3d at 1206. Conversely, if the records are not reasonably reflective of cost, Commerce may appropriately deviate from them. *See id.* Commerce found it necessary to pursue the latter course when it deviated from the books and records with respect to the shared costs cited by TIPCO et al.

As to the raw material costs, however, the relative consistency of the allocation methodologies, the historical reliance by TIPCO et al. on their books and records, and the acceptance of these records by independent auditors support Commerce's determination to rely on the normal allocation methodologies of TIPCO et al. Antidumping investigations are complex and complicated matters in which Commerce has particular expertise and thus, Commerce's determinations are entitled to deference. *See Chevron*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694. We conclude, therefore, that Commerce's reliance on the books and records of TIPCO et al. was reasonable and is supported by substantial evidence.

TIPCO et al. also argue that our decision in *IPSCO III* requires allocation of pineapple fruit costs to be made on the basis of weight and that the Court of International Trade's decision is, therefore, proper. This argument is also made by Dole. We discuss this issue in Section III below.

### B. Dole

Dole agrees that its normal allocation methodology, allocating 100% of the pineapple fruit cost to canned pineapple fruit, was distorted because it resulted in an overstatement of the cost of production for canned pineapple fruit. Dole, however, argues that the Court of International Trade correctly applied this court's holding in *IPSCO III* to reject Commerce's decision to rely on the normal allocation methodologies of TIPCO et al.

In its *Final Determination*, Commerce concluded that Dole's normal allocation methodology resulted in an unreasonable allocation of all of the pineapple fruit costs to canned pineapple fruit. Commerce noted the relative consistency of the range of allocation percentages used by TIPCO et al., and determined that other companies in the Thai industry recognized some measure of value existed for the portion of the pineapple fruit used in juice production.

Commerce also noted that Dole occasionally purchased some quantity of small pineapple fruit, at a discounted price, for the specific purpose of making juice products. Commerce concluded that the purchase of the smaller pineapples indicated that Dole should recognize some value for the portion of the raw pineapple fruit used for juice. As a result, Commerce used an average of the fruit cost allocation percentages used by TIPCO et al. to calculate the pineapple fruit costs for Dole's canned pineapple fruit.[6]

The methodologies relied upon by Commerce in making its determinations are presumptively correct. *See Fujitsu* at 1044. Although Dole challenged Commerce's use of the allocations of TIPCO et al. before the Court of International Trade, that court did not reach Dole's arguments in light of its finding that the normal allocation methodologies were not reasonably reflective of the Thai producers' costs of production. Dole has not repeated that challenge here, and thus we are not presented with any information that would rebut the presumptive correctness of Commerce's use of the TIPCO et al. average for determining Dole's cost of materials.

TIPCO et al. recognized some value existed for the portions of the pineapple fruit used for juice production. Given the relative consistency of the allocations of TIPCO et al., we are satisfied that Commerce's decision to use an average of the fruit cost allocation percentages used by TIPCO et al. to determine Dole's cost of materials for canned pineapple fruit is reasonable and supported by substantial evidence.

### III.

Finally, Appellants argue that *IPSCO III* does not control the outcome of this case. We agree. In reversing Commerce's determination, the Court of International Trade stated that "[i]n every co-

product case where output prices vary greatly among co-products, value based allocation is intuitively appealing for anti-dumping purposes, but is not permitted." *Thai Pineapple I*, 946 F.Supp. at 22. The court held that *IPSCO III* required a weight-based or other "non-output price-based" method of allocating raw material cost between co-products and remanded the case to Commerce to make such an allocation. *See Thai Pineapple I* at 22–24 (stating that *IPSCO III* "specifically found that Commerce's weight-based cost (non-value) methodology was correct, not just permissible").

In its *Final Determination*, Commerce found that the Thai producers had failed to demonstrate that their new allocation methodologies based on weight were more reliable than the verified and audited normal allocation methodologies of TIPCO et al. In so doing, Commerce concluded that "[u]sing weight alone as the allocation criteria set up the illogical supposition that a load of shells, cores, and ends cost just as much as an equal weight of trimmed and cored pineapple cylinders." *Final Determination* at 29560. Commerce relied on the example of a hog, noting that "if the joint cost of a hog were assigned to its various products on the basis of weight, center-cut pork chops would have the same unit cost as pigs' feet, lard, bacon, ham and so forth. Fabulous profits would be shown for some cuts, although losses consistently would be shown for other cuts." *Id.* Because the parts of the pineapple, i.e., the cylinder, core, shells, and ends have significantly different uses and values, they are not interchangeable when it comes to canned pineapple fruit versus juice production. Commerce found that the Thai producers placed a higher value on the raw pineapple fruit which was used in the production of canned pineapple fruit, as evidenced by the lower price to suppliers of smaller pineapple fruit. *Final Determination* at 29561. As a result, Commerce

---

**6.** In selecting an allocation method for Dole, Commerce considered various allocation possibilities, but concluded that the record in the investigation did not contain the data necessary to develop an allocation methodology for Dole based on historical data.

found it unreasonable to value all parts of the pineapple using a weight-based allocation methodology.

*IPSCO III* involved the manufacture of oil country tubular goods (pipe). The production process yielded products of different quality, one of which was graded as prime pipe and the other as limited service pipe. Because the different pipe quality came from a simultaneous process, Commerce determined that the two types of pipe had identical production costs and therefore allocated such costs based on weight.

The Court of International Trade, however, rejected the weight-based allocation and instead required Commerce to take into account the difference in output value between the prime and limited service pipe. On remand, Commerce reallocated the costs for the prime and limited service pipe on the basis of their relative prices in the United States market.

This court rejected the value-based allocation methodology in our *IPSCO III* decision and sustained Commerce's determination that a weight-based allocation should be used. The steel pipe was manufactured from the same raw material and underwent one production process, but that process produced two different grades of pipe. We held that it was improper for the Court of International Trade to impose what was a circular methodology, which allocated production costs based on the relative value of the finished pipe, in lieu of Commerce's presumptively correct weight-based allocation. Under the facts of that case, Commerce's use of a weight-based allocation methodology was a reasonable interpretation of the statute.

In this case, however, pineapple fruit is not a homogeneous raw material like the raw material used to make the pipe in *IPSCO III*, and the production process is entirely different for the various pineapple products produced. The whole pineapple must be reduced to its various components—cored cylinders, cores, shells and ends—prior to entering the production processes for canned pineapple fruit and

juice. Although the raw material was purchased as a whole, for a set price per unit of weight, the parts of the pineapple differ in their usefulness and value.

The Court of International Trade rejected a reasonable allocation methodology which Commerce determined recognized the use and value of the raw material. The methodology used by Commerce was neither price-based nor circular. Commerce's allocation of the cost of the raw pineapple fruit between canned pineapple fruit and other products was not based on the selling price or output value of these products. Thus, unlike *IPSCO III*, the selling price of the canned pineapple fruit products was not a factor in determining the cost of raw material component in Commerce's calculation of COP and CV. Instead, Commerce's methodology reflected the raw material allocations of TIPCO et al. as shown by their books and records. Thus, under the facts of this case, we conclude that the Court of International Trade improperly held that *IPSCO III* was controlling precedent.

## CONCLUSION

Substantial evidence supports Commerce's determination that the Thai producers' normal allocation methodologies for raw pineapple fruit, as shown by their books and records, was reasonable. These allocation methodologies had been in use for a number of years, and had been consistently relied upon by the Thai producers to present important financial information to shareholders, tax authorities, and other third parties, including independent auditors. Although Commerce rejected Dole's normal allocation methodology, it was reasonable in doing so because Dole admittedly overstated the costs of canned pineapple fruit by allocating no part of the raw pineapple fruit cost to juice production. Commerce's use of the average of the fruit cost allocation percentages used by TIPCO et al. for Dole was also reasonable because its weight-based alternative methodology was not supported by the evidence. We con-

clude in this case that Commerce's interpretation was reasonable, supported by substantial evidence, and thus entitled to deference. For the reasons stated, the decision of the Court of International Trade is

*REVERSED.*