Slip Op.  06 - 96

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
|---|---|---|
| AGRO DUTCH INDUSTRIES, LTD., | : | |
| Plaintiff, | : | |
| v. | : | **Before: MUSGRAVE, Judge** |
| | : | Court No. 04-00493 |
| UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| COALITION FOR FAIR MUSHROOM TRADE, | : | |
| Defendant-Intervenor. | : | |

[Further clarification ordered regarding antidumping duty administrative review.]

Dated: June 23, 2006

*Garvey Schubert Barer* (*Lizbeth R. Levinson*, *Ronald M. Wisla*), for the plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, *Patricia M. McCarthy*, Assistant Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*Richard Schroeder*); and Office of Chief Counsel for Import Administration, U.S. Department of Commerce (*Matthew D. Walden*), of counsel, for the defendant.

*Kelley Drye Collier Shannon* (*Michael J. Coursey*, *Adam H. Gordon*), for the defendant-intervenor.

**OPINION AND ORDER**

Without concluding whether substantial evidence supported the administrative finding that

the expenses of transporting recalled merchandise from the United States to India constitute indirect

selling expenses associated with U.S. sales, the Court remanded for reconsideration and clarification

of Commerce's antidumping duty calculus on the matter. *See* Slip Op. 06-40 (CIT Mar. 28, 2006); *Certain Preserved Mushrooms From India: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 51630 (Aug. 20, 2004) & accompanying *Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review on Certain Preserved Mushrooms from India – February 1, 2002, through January 31, 2003* (Aug. 20, 2004) ("*Decision Memorandum*"), as amended by *Notice of Amended Final Results of Antidumping Duty Administrative Review: Certain Preserved Mushrooms From India*, 69 Fed. Reg. 55405 (Sep. 14, 2004). The Department of Commerce, International Trade Administration ("Commerce" or "DOC") was also asked to consider whether the entire movement of the merchandise from India to the United States and back should be treated as an extraordinary expense that would distort the dumping calculation if included therein. Draft administrative remand results went to the parties on April 28, 2006 and Commerce submitted the same to the Court after time passed without comment. *See Results of Redetermination Pursuant to Remand* (May 11, 2006) ("*Redetermination*"). The Clerk of the Court recently confirmed that neither Agro Dutch nor the Coalition for Fair (Preserved) Mushroom Trade (CFMT) intend to comment on the remand results.

As mentioned, the Court deferred discussion of Agro Dutch's argument that the recall of the merchandise to India involved direct expense to subsequent third country sale(s), that the recall was strictly a business decision that ultimately proved correct, and that therefore Commerce wrongly included the movement costs in U.S. indirect selling expenses. *See* Pl.'s Rule 56.2 Mot. for J. Upon the Agency Rec. ("Pl.'s Br.") at 8-9 . The government's response was that Commerce's practice is to treat expenses related to returned or rejected merchandise as indirect selling expenses in the

market for which the expenses were incurred. Def.'s Mem. in Opp'n to Pl.'s Mot. ("Def.'s Br.") at 9 (referencing *Decision Memorandum* at 3; *Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Televisions From Malaysia*, 69 Fed. Reg. 20592, and attached *Issues and Decision Memorandum* at comment 2 (April 16, 2004) (freight expenses associated with returns of subject merchandise should be included in indirect selling expense calculation of the entity that incurred the expenses); *Notice of Final Determination of Sales at Less Than Fair Value: Foam Extruded PVC and Polystyrene Framing Stock From the United Kingdom*, 61 Fed. Reg. 51411, 51416-17 (Oct. 2, 1996) (regarding return freight charges, "[w]here an expense cannot be tied to a sale within the POI, the expense is considered indirect")). The government argued that Commerce's inclusion of the return expenses in Agro Dutch's U.S. indirect selling expense calculation was consistent with this practice and that only if the rejected merchandise at issue had been shipped directly to such other country or countries without being returned to inventory in India might Agro Dutch have a viable argument. *Id*. at 9-10 (referencing *Certain Porcelain-on-Steel Cookware From Mexico: Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 42496, 42502 (Aug. 7, 1997) (noting that "freight charges for later sales would begin at the point of shipment associated with the later sale")). In light of Commerce's *Redetermination* and the absence of further comment thereon, it is now appropriate to address Agro Dutch's claim.

The standard for judicial review of an administrative review of an outstanding antidumping duty order is whether the agency's determination is supported by substantial evidence on the record. 19 U.S.C. § 1516a(b)(1)(B)(i). That requires review of the record as a whole: that which supports as well as that which "fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd.*

*v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). But, where the record may lead to inapposite findings, if Commerce's conclusion is not unreasonable the Court must refrain from substituting its own conclusion thereon. *See American Silicon Technologies v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (determination may be supported by substantial evidence of record "[e]ven if it is possible to draw two inconsistent conclusions from evidence in the record") (citation omitted); *Thai Pineapple Public Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999) (same). *Cf. Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 837 F.2d 465, 467 (Fed. Cir. 1988) ("[w]hen the court said Commerce's merchandise comparison methodology was 'unreasonable,' it was using a shorthand word for unsupported by substantial evidence on the record").

Agro Dutch attempts to persuade that Commerce's conclusion is unreasonable, but arguing that the movement expenses resulted from a legitimate business decision and are direct rather than indirect does not persuade, *a fortiori*, to the extent that it would be unreasonable to treat these expenses as indirect selling expenses associated with U.S. sales during the period of review. That is to say, it is not apparent from the evidence of record that the U.S.-to-India movement cost *must* be treated as direct expenses attributable to the ultimate foreign market sale. It may be true, as Agro Dutch argues, that its situation differed from the administrative determinations cited by the government and CFMT to support the notion that these expenses are indirect, selling, and associated with U.S. sales, and that certain aspects of the referenced determinations might be interpreted as supportive of Agro Dutch's rather than the government's position,[1] but without more, Agro Dutch's

---

[1] *See* Pl.'s Br. at 8-9; Def.'s Resp. at 9-10; Resp. Br. of Def.-Int. The Coalition for Fair Preserved Mushroom Trade at 6; Pl.'s Reply at 3-4 (distinguishing *Certain Porcelain-on-Steel Cookware From Mexico*, *supra*, 62 Fed. Reg. at 42502; *Certain Color Television Receivers From*

(continued...)

arguments reduce to a difference of opinion with Commerce.  For example, if there is a precise generally accepted accounting principle that would require that these moving expenses be accounted a direct cost of the foreign sale to which the recalled merchandise was ultimately delivered, taking into account their intermediate return to inventory in India, Agro Dutch does not elaborate.  It does not, therefore, successfully attack Commerce's general cost methodology, with which the instant administrative determination appears consistent.[2]  *Cf.* 19 U.S.C. § 1677b(f) (requiring consideration of all available evidence on proper allocation of costs); *Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363 (Fed. Cir. 2005) (respondent's methodology insufficient to undermine agency's preferred method so long as agency method supported by substantial evidence on the record); *Thai Pineapple, supra*, 187 F.3d at 1365 (methodologies relied upon by Commerce in making its determinations are presumptively correct) (citation omitted).  In short, Agro Dutch's arguments do

---

[1]  (...continued)
*Malaysia, supra*, 69 Fed. Reg. 20952 at comment 2; *Foam Extruded PVC and Polystyrene Framing Stock From the United Kingdom, supra*, 61 Fed. Reg. at 51416-17).

[2]  According to the *Oxford English Dictionary*, "direct" means "6. a. Effected or existing without intermediation or intervening agency; immediate . . . f. Of or pertaining to the work and expenses actually incurred during production as distinct from subsidiary work and overhead charges, *i.e.*, to prime or initial costs or charges" while "indirect" means "1 a. Of a way, path, or course: Not straight; . . . 5. Of or pertaining to the work and expenses which cannot be apportioned to any particular job or undertaking[;] pertaining to overhead charges and subsidiary work. (*Cf.* ['direct'] *a.* 6[.] f.)" *Oxford English Dictionary*, vol. IV, pp. 702-03, vol. VII  p. 872 (2d ed. 1989). *Cf.* 19 C.F.R. § 351.410(c) ("'[d]irect selling expenses' are expenses, such as commissions, credit expenses, guarantees, and warranties, that result from, and bear a direct relationship to, the particular sale in question") & § 351.412(f)(2) ("[i]n making the constructed export price offset, 'indirect selling expenses' means expenses, other than direct selling expenses or assumed selling expenses (*see* § 351.410), that the seller would incur regardless of whether particular sales were made, but that reasonably may be attributed, in whole or in part, to such sales"). *See also* Slip Op. 06-40 at 6.  On a close call as to accounting treatment, the apportionment of a charge or expense would appear to be in the eye of the beholder.

not lead to the inevitable conclusion that the administrative treatment of the movement expenses of the recalled sales from the United States to India, as indirect expenses associated with United States sales, was unreasonable.

Commerce was also asked upon remand whether the expense of recalling the merchandise was extraordinary or otherwise distortive of Agro Dutch's experience. The *Redetermination* reports that there is no information on the record indicating that these expenses are extraordinary or otherwise distortive to Ago Dutch's margin because Commerce has

> no benchmark for establishing Agro Dutch's normal experience. No party raised this issue during the course of the review. Commerce has stated in a previous segment of this proceeding that "it is incumbent upon the respondent, as the party knowledgeable about the industry and country, to provide evidence supporting" a claim that a cost or expense is extraordinary or distortive. *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Preserved Mushrooms from India*, 63 FR 72246, 72251 (December 31. 1998). Agro Dutch did not provide any evidence that incurring expenses for recalling rejected merchandise is an extraordinary event. Accordingly, we do not find these expense to be extraordinary or otherwise distortive. *See id.* (finding the death of an employee, flooding and crop disease not to be extraordinary).

*Redetermination* at 4-5.

Arguably, declaring that there is no benchmark ignores or even undermines determinations of "normal" value for Agro Dutch. *See*, *e.g.*, *Certain Preserved Mushrooms From India*, 68 Fed. Reg. 41303 (Jul. 11, 2003) (final review results). Also, to conclude that the U.S.-to-India movement costs are not attributable to third country sales is restating that such expenses would be considered extraordinary to such sales. But, since Agro Dutch chose not to comment or provide Commerce with a reason to conclude otherwise, the determination that the expenses at issue were not extraordinary, relative to sales during the period of review, is supported by substantial evidence on the record.

As mentioned, the Court remanded for clarification of the impact of the movement expenses on Commerce's dumping calculation. Commerce's response is that the movement expenses affected Agro Dutch's margin through the calculation of the commission offset, which is a circumstance-of-sale adjustment to normal value pursuant to 19 U.S.C. § 1677b(a)(6)(C)(iii). The commission offset regulation is as follows:

> (e) Commissions paid in one market. The Secretary normally will make a reasonable allowance for other selling expenses if the Secretary makes a reasonable allowance for commissions in one of the markets under considerations [*sic*], and no commission is paid in the other market under consideration. The Secretary will limit the amount of such allowance to the amount of the other selling expenses incurred in the one market or the commissions allowed in the other market, whichever is less.

19 C.F.R. § 351.410(e).

The *Redetermination* explains that the commission offset entailed upward adjustment of normal value[3] because most U.S. export price sales did not involve payment of a commission, whereas the surrogate foreign market selling expense data for Agro Dutch (*i.e.*, the weighted average selling expense data for Premier and Weikfield) showed positive ratios for commissions in the home market, *viz*:

> The statute instructs Commerce to include selling expenses in the calculation of [constructed value ("CV")] that are ". . . in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country." *See* section 773(e)(2)(B)(ii) of the Act.

---

[3] The Court earlier noted that the offset had been explicitly applied to Premier and Weikfield but not to Agro Dutch and wondered whether, if such were applicable to Agro Dutch's situation, it might actually have been to Agro Dutch's benefit. *See* Slip Op. 06-40 n.3. The impact in this instance, however, was upward adjustment of normal value by approximately 1.26 percent, according to Commerce's "Hypothetical Recalculation of Agro Dutch's Amended Final Results." *Cf. Redetermination* at 4 (referencing Remand Conf. Doc. 1).

        To calculate these selling expenses, Commerce used the weighted-average comparison market selling expenses derived from the data of the other respondents in the review. These calculations, expressed as ratios to be applied in the CV calculation, appear at Attachment 1 to the August 13, 2004, Memorandum to the File entitled "Agro Dutch Final Results Notes and Margin Calculation" (Proprietary Document 50) (Final Results Calculation Memorandum). The attachment shows a positive ratio for home market commissions. Agro Dutch incurred commissions on some, but not most, U.S. sales in this review (*see* May 21, 2003, Questionnaire Response at pages C-28-29 (Public Document 29)). Therefore, for comparisons to U.S. sales where no commission expenses were incurred, 19 CFR 351.410(e) applies and Commerce made a circumstance-of-sale adjustment to Agro Dutch's CV-based [normal value ("NV")] up to, or capped by, the amount of other selling expenses incurred in the U.S. market, *i.e.* the U.S. indirect selling expenses, including the expenses at issue. . . .

                                           * * *

        Net Effect: The reduction in NV for the comparison market commissions is offset by the addition of an amount equal to the total of U.S. indirect selling expenses, which includes the expenses for the rejected sales.

*Redetermination* at 2-4. That being the case, the following lines of program, to which the

*Redetermination* refers in part, appeared relevant:

line 1992:       DINDIR3U and DINSIR4U are added to other indirect selling expenses to create the aggregate variable XPTINDSU.

line 2458:       XPTINDSU (U.S. indirect selling expense variable) is renamed MUSOTHIS, which is used in the calculation to determine the offset amount to the home market commission amount.

line 2488:       Comparison market commissions (CMCOMMIS) are set equal to "HMCOMM". The explanatory note defines this process as the comparison market commission in U.S. dollars.

lines 2493-94:  These lines appear to test whether comparison market commissions (CMCOMMIS) are equal to zero; if so then "CMINCOMM" is defined as constructed value comparison market indirect selling expenses, plus certain additions (CMINDSEL), otherwise CMINCOMM is set to zero;

lines 2573, 2577, 2588:

                 According to the *Redetermination*, this is where the comparison market commissions are calculated (referenced

in the *Redetermination* as CMCOMMIS) and net constructed value is calculated exclusive of these commissions.

line 2612:     The weighted average selling expense and profit ratios for constructed value from Premier and Weikfield are calculated, CMINCOMM is apparently redefined to the relevant comparison market indirect selling expenses (ISELCV) plus certain additions (INVCVR * COPCV) and converted into dollars (MUSXRATE).

line 2691:     (1)  If the amount of comparison market commissions (CMCOMMIS) is greater than the amount of U.S. commissions (MUSCOMM), the commission offset is the lesser of either (a) the U.S. indirect selling expenses (MUSOTHIS), or (b) the difference between the comparison market commissions and U.S. commissions.
(2)  If the amount of U.S. commissions (MUSCOMM) is greater than the amount of comparison market commissions (CMCOMMIS), the commission offset is the lesser of either (a) CMINCOMM or (b) the difference between the U.S. commissions and the comparison market commissions.
(3) If there are no U.S. commissions (*i.e.*, MUSCOMM = 0), the commission offset is equal to the lesser of U.S. indirect selling expenses (MUSOTHIS) or comparison market commissions (CMCOMMIS).

line 2700:     Calculation of the NV in this EP situation, which subtracts the offset amount from comparison market net price in U.S. dollars (FUPDOL). (Since OFFSET is a negative value, it is actually added to FUPDOL.)

*See* Conf. Doc. 53 at 145-152.

The foregoing is too convoluted.  First, if CMCOMMIS is defined by lines 2573, 2577 and 2588, it is intelligible.  There is, however, a definition of COMMCV at line 2573.  Also, the commission offset regulation supposedly applies only when commissions in one of the markets under consideration obtains a reasonable allowance "and *no* commission is paid in the other market under consideration."  19 C.F.R. § 351.410(e) (italics added).  By contrast, the computer program appears to calculate a commission offset under any circumstance, not only when "no commission

is paid in the other market under consideration."  Condition (2) should never occur, given that the concern in this instance is supposedly over "a positive ratio for home market commissions," and, in accordance with 19 C.F.R. § 351.410(e), condition (1) should only apply so long as there are no U.S. commissions (MUSCOMM = 0), in which case condition (3) would also apply.  But it is unclear whether the data should only trigger such conditionality, given that the *Redetermination* explains that some sales to the U.S. involved commissions and some did not.

Some, apparently, involved both.  Referencing the ten highest and five lowest margins for each type of comparison for Agro Dutch, the *Redetermination* undertakes a walk-through of the effect of the programming using the first observation of output as representative, but examination of observations six and seven indicates that a commission offset was calculated despite positive amounts of commissions for both the U.S. and the comparison market sales.  *Cf. Redetermination* at 4 *with* Conf. Doc 50 at 167-172.

With Commerce's indulgence, it is therefore necessary to obtain a fuller picture before the matter may be sustained.  Commerce shall provide a brief explanation of why its computer program comports with 19 U.S.C. § 351.410(e) within ten days from the date hereof.


**SO ORDERED.**


                                                    /s/  R. Kenton Musgrave
                                                    R. KENTON MUSGRAVE, JUDGE


Dated: June 23, 2006
          New York, New York